IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TRACY PETTIT,

                Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security,

                Defendant.

OPINION AND ORDER

17-cv-566-wmc

---

Plaintiff Tracy Pettit seeks judicial review of an adverse decision of the Commissioner of Social Security, pursuant to 42 U.S.C. § 405(g), which denied her eligibility for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act, codified at 42 U.S.C. §§ 1614(a)(3)(A). Pettit contends that the administrative law judge ("ALJ") erred when he omitted from his residual functional capacity ("RFC") assessment certain limitations related to Pettit's neck pain. In particular, Pettit asserts that the ALJ erred when he (1) found that she could perform bilateral overhead reaching on a "frequent" basis, (2) failed to account for her limitations in moving her head, and (3) failed to account for her testimony that she would require significant rest breaks.

Having considered Pettit's arguments in light of the administrative record and the ALJ's decision, the court finds that the ALJ's RFC assessment is adequately supported by evidence in the record and his reasons for rejecting contrary evidence are clear enough to withstand scrutiny. Accordingly, the decision of the Commissioner will be affirmed.

1

## BACKGROUND[1]

### A. Social Security Application

On August 15, 2013, Pettit filed a Title XVI application for SSI, alleging disability beginning April 1, 2012. Her application was denied initially on October 29, 2013, and again upon reconsideration on May 29, 2014. (AR 68-78, 79-89.) A hearing to reconsider the denial of SSI was held on February 2, 2016 October 30, 2012, before ALJ John Martin, at which Pettit was both represented by counsel and also testified. (AR 36-67.) The ALJ also heard and considered the testimony of Jacquelyn Wenkman, a neutral vocational expert.

On April 12, 2016, the ALJ issued a written decision denying Pettit's application for SSI. (AR 18-31.) The ALJ found that although Pettit has severe impairments, including cervical degenerative disk disease and a history of two neck surgeries, she was not disabled within the meaning of the Social Security Act from April 1, 2012, through the date of the opinion. This decision became the final decision of the Commissioner of Social Security on May 23, 2017, when the Appeals Council declined Pettit's request for review of the ALJ's decision. (AR 1-3.)

### B. Plaintiff's Background

Pettit was born on May 25, 1972, making her 43 years old on the date of the ALJ's decision. She has a 9th grade education, having dropped out of school in 10th grade because

---

[1] The following facts are drawn from the administrative record ("AR"). (Dkt. #7.)

of problems with dyslexia, truancy and tardiness. She later obtained a certified nursing assistance certificate. She was last employed as a housekeeper for Rusk County Hospital. At the time of the hearing, she was married and lived with her husband and 17-year-old daughter.

### C. Overview of Medical Issues

Pettit has a history of neck problems with associated radiating arm pain and weakness and carpal tunnel syndrome on the left. She has undergone two cervical surgeries in which discs were removed and the joints fused: the first performed by Dr. Philip Porter on January 5, 2012, at the C6/C7 joint, and the second performed by Dr. Neal on July 11, 2013, at the C5/C6 joint. (AR 224-25, 326-27). During the July 11, 2013 procedure, Dr. Neal also performed carpal tunnel release surgery on Pettit's left wrist. (AR 326-27). Pettit received physical therapy for her neck and wrist after the surgery. (AR 242, 341-50.)

Although the surgeries and physical therapy helped to alleviate her arm pain and carpal tunnel symptoms, Pettit complained to her doctors that she still had pain in the back of her neck and shoulders, which sometimes radiated into her right arm and hand, as well as pain in the thumb and forefinger of her left hand. (AR 398-403.) Testing showed, however, that Pettit's arm strength, tone and reflexes were good and none of her nerves were impinged. She had tenderness in her neck and upper back which her doctors concluded was caused by muscular irritation. Pettit was also noted to have limited range of motion in her neck, with her ability to turn her head left or right limited to somewhere between 30 and 45 degrees. With respect to her upper extremities, however, plaintiff was

3

noted in January 2014 to have "good gross passive pain-free range of motion." (AR 402.) Her doctor prescribed medication for her myofascial pain and advised her to learn about biofeedback and relaxation techniques and consider alternative treatments such as acupuncture and massage. (AR 403.)

Despite relatively normal objective findings, Pettit continued to complain of and seek treatment for neck and upper back pain that radiated into her arms, mainly on the left. In February 2014 and October 2014, she had nerve conduction studies, which were normal. (AR 409, 1153). In April and May 2015, she received nerve root block injections at the C6 level, but neither provided any long-term benefit. (AR 1255.)

The latest medical records before the ALJ showed that Pettit had a pain clinic visit with nurse practitioner Lisa Tennyson in December 2015, at which Pettit reported being in constant pain that she rated a 10 out of 10 over the preceding week. (AR 1254.) Tennyson observed, however, that Pettit did not appear to be in any acute distress, walked with a normal gait and did not demonstrate any abnormal movements. On examination, Pettit had normal strength, bulk, tone and reflexes, although she did not have full range of motion in her cervical or lumbar spine. Tennyson also noticed that Pettit had myofascial pain and tenderness with trigger points present along the muscles in her upper back. (AR 1256.)

Tennyson noted that a recent x-ray of Pettit's neck showed that her fusions remained solid. She recommended that Pettit get an updated MRI of her cervical spine to see if there was any nerve root impingement that might explain her ongoing cervical and neck pain complaints. She also prescribed a muscle relaxer, a medication to treat nerve

pain, and lidocaine patches. (She could not prescribe opioids because Pettit had previously had a urine screen that showed the presence of methamphetamine and alcohol.) Tennyson also recommended that Pettit return to physical therapy, try a TENS unit and stop smoking. (AR 1256-57.)

### D. Medical Opinions

The administrative record contains few medical opinions. In December 2012, after plaintiff's first surgery but before the second, Dr. Porter indicated that he was not issuing specific work restrictions for plaintiff but advised her to look for employment that did not involve repetitive neck movements or work above shoulder level. (AR 213.) A month later, Porter completed a work restrictions form on which he indicated that Pettit should work above shoulder level only occasionally (11-33% of the time). (AR 214.) On August 26, 2013, approximately six weeks after Pettit's second surgery, Dr. Steven Lamberson opined that after Pettit recovered, he expected "that she would be limited to light to light-med work for the foreseeable future[.]" (AR 244-45.) Dr. Lamberson did not offer any opinion on Pettit's ability to perform overhead work.

Two months later, on October 25, 2013, Mini Khorshidi, M.D., a consultant for the state disability agency, reviewed Pettit's medical record and concluded that Pettit could perform light work (which is defined as lifting or carrying up to 20 pounds occasionally and 10 pounds frequently, and either standing or walking a good deal or sitting most of the time with some pushing and pulling of arm or leg controls), but that her ability to perform overhead reaching on both sides was "limited" due to her cervical fusion surgeries.

5

(AR 75-76.) On reconsideration seven months later, a different state agency consultant, Dr. Janis Byrd, concluded on May 23, 2014, that Pettit could perform the full range of light work with no limitations on reaching, overhead or otherwise. (AR 87.)

### E.  Hearing Testimony

At the hearing, Pettit testified that although the second surgery had helped to resolve her left arm pain numbness, she still had pain radiating from her neck down into her arms, mainly on the left. (AR 47, 58.) She said she typically spent up to five hours of her day in a recliner or in bed because the pain in her neck "gets so bad that it's worse than having a migraine." (AR 52.) Pettit said she had not had the MRI recommended by Tennyson because her insurance would not cover the cost. (AR 56.)

Pettit said the pain in her arms made it difficult to extend them fully in front of her, lift more than 10 pounds, or reach overhead. (AR 49, 52, 54.) She also testified that she did not have full range of motion in her neck, which made it difficult to check her blind spot while driving. (AR 51.) She said her father had driven her to the hearing and that he or her husband usually drove her if she needed to go somewhere. (AR 43.) As a result of her pain, Pettit said, she had given up her previous hobbies such as horse riding, boating and gardening and her husband and daughter had taken over most of the household chores. (AR 54-55.)

## F. Administrative Law Judge's Decision

Applying the Commissioner's five-step procedure for evaluating disability claims, *see* 20 C.F.R. § 416.920, the ALJ found that Pettit had not engaged in substantial gainful activity after she applied for benefits (step 1); she had the severe impairments of cervical degenerative disc disease and a history of two cervical fusion surgeries and left carpal tunnel release surgery (step 2); none of Pettit's impairments singly or in combination met the criteria of a listed impairment (step 3); she was unable to perform her past relevant work (step 4)[2]; and there were nonetheless jobs existing in significant numbers in the national that she could perform (step 5).

As a predicate to his findings at step 4 and 5, the ALJ assessed Pettit's RFC and found she was able to perform light work but could not reach more than "frequently" in any direction or overhead.[3] (As used in the vocational context, "frequent" means occurring from one-third to two-thirds of the time, while "occasional" means occurring from very little up to one-third of the time. *See* Soc. Sec. Ruling 83-10.) In crafting this RFC, the ALJ indicated that he was giving "great weight" to the opinions of the state disability medical consultants, Dr. Khorshidi and Dr. Byrd, but that Khorshidi's assessment was entitled to greater weight because her determination that Pettit had some limitations in

---

[2] The ALJ noted that although Pettit had worked as a certified nursing assistant and housekeeper/cleaner, her work history was "sporadic at best" and failed to rise to the level of substantial gainful activity. Accordingly, he found that she did not have any "past relevant work" as that term is defined in the Social Security regulations. (AR 29.)

[3] The ALJ also found that, because of asthma, Pettit should avoid concentrated exposure to respiratory irritants. This finding is not in dispute.

7

her ability to perform reaching overhead was more consistent with Pettit's history of two cervical fusions. Nonetheless, the ALJ found that Pettit's ability to perform reaching activities was not quite as restricted as Dr. Khorshidi had found, explaining that Pettit's "manipulative functional abilities have improved since surgery." (AR 29.) This was evidenced, said the ALJ, "by Dr. Byrd's determination that the claimant would no longer require any such limitations." (*Id.*)

In finding Pettit could perform a substantial number of jobs in the national economy in spite of her limitations, the ALJ relied on the testimony of a vocational expert, who testified that a person of plaintiff's age, education and work experience with the limitations described by the ALJ's RFC would be able to perform the jobs of office helper (Dictionary of Occupational Titles ("DOT") code 239.567-010), counter attendant (DOT code 249.366-010), and lobby attendant (DOT code 358.677-018).

Additional details about the ALJ's decision will be incorporated as necessary in the analysis below.

OPINION

## I. Standard of Review

The standard by which a federal court reviews a final decision by the Commissioner of Social Security is well settled. Findings of fact are "conclusive," so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the

Commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the Commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

At the same time, the court must conduct a "critical review of the evidence" before affirming the Commissioner's decision, *Edwards*, 985 F.2d at 336. If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th 2006). To build this bridge, "the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger*, 516 F.3d at 544.

In reviewing the decision, the court must confine its review to the reasons put forth by the ALJ, not post-hoc explanations offered by the government's lawyers, unless the court is convinced that a remand for further proceedings would not lead to a different outcome. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced."); *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e will not remand

a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result.").

Pettit argues that the ALJ erred by failing in his RFC assessment to include the following limitations: (1) an inability to perform frequent bilateral overhead reaching; (2) an inability to move her head; and (3) a need to take significant rest breaks throughout the day.[4]

## II. Overhead Reaching

Citing exclusively to her hearing testimony, Pettit argues that the ALJ erred in finding that she could perform bilateral overhead reaching on a "frequent" basis. According to Pettit, her testimony supports a finding that her ability to reach overhead is limited to "occasionally," or up to one-third of the workday.[5] (Pl.'s Br. (dkt. #9) 33.)

As a preliminary observation, neither party has said whether a reduction in Pettit's ability to perform overhead reaching from up to two-thirds of the day to only one-third of

---

[4] Pettit also makes the general argument that the "The ALJ failed to comply with SSR 96-8p," but she does not develop that argument beyond identifying specific limitations that she says the ALJ overlooked. (*See* Br. in Supp. (dkt.# 9) 33-34.) Accordingly, the court does not address SSR 96-8p other than to review whether substantial evidence supports the ALJ's RFC assessment.

[5] Counsel for plaintiff has incorporated the entire transcript of the administrative hearing in the body of her brief. This is unnecessary, as the transcript is included in the administrative record filed with the court. Counsel is advised to refrain from this practice in future cases and to focus in his brief on presenting arguments and authorities in favor of reversal of the Commissioner's decision. Although it is proper to highlight important evidence, including the entire transcript is an unnecessary distraction that is of little benefit to the court.

the day would make any difference to the ALJ's step five determination. Although the court is not a vocational expert, a simple reading of the duties required of the jobs identified by the VE at the hearing suggests that, at minimum, Pettit would be able to perform the office helper job[6] even if she could reach overhead only one-third of the day. As described in the *Dictionary of Occupational Titles*, an office helper

> [p]erforms any combination of following duties in business office of commercial or industrial establishment: Furnishes workers with clerical supplies. Opens, sorts, and distributes incoming mail, and collects, seals, and stamps outgoing mail. Delivers oral or written messages. Collects and distributes paperwork, such as records or timecards, from one department to another. Marks, tabulates, and files articles and records. May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine. May deliver items to other business establishments.

*See* www.govtusa.com/dot, Code 239.567-010 (last visited August 31, 2018). None of these tasks appear to involve significant, if any, overhead reaching. Nevertheless, the Commissioner has not argued harmless error. Accordingly, the court shall proceed to evaluate the merits of Pettit's objection to the RFC finding.

The agency has prescribed a two-step process for evaluating a claimant's own description of his or her impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." Social Security Ruling 16-3p; Titles II and XVI: Evaluation of Symptoms in Disability Claims, 81 FR 14166-01

---

[6] The VE offered the unchallenged testimony that 233,000 such jobs exist nationally, undoubtedly a "significant number." *Collins v. Berryhill*, No. 17-3189, 2018 WL 3783601, *4 (7th Cir. Aug. 9, 2018) (50,00 jobs in nation a significant number) (unpublished disposition).

11

(superseding SSR 96-7p); *see also* 20 C.F.R. § 416.929. If the ALJ answers this question affirmatively, then he will "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." SSR 16-3p, at *2.[7] When faced with a discrepancy between the objective evidence and the claimant's subjective complaints, the ALJ is to resolve the discrepancy by considering "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, at *4. When a court reviews the ALJ's assessment of the claimant's subjective complaints, the court looks to see whether the ALJ's credibility determination is "reasoned and supported," as it may be overturned only if it is "patently wrong." *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). A credibility determination is patently wrong if it is illogical or "lacks any explanation or support." *Id*.

---

[7] With the recent issuance of SSR 16-3p, the Social Security administration has indicated that it would no longer assess the "credibility" of a claimant's statements, but would instead focus on determining the "intensity and persistence of symptoms." Social Security Regulation (SSR) 16-3p, at *2. Reflecting on this change in wording, the Court of Appeals for the Seventh Circuit has opined that it "is meant to clarify that administrative law judges are not in the business of impeaching claimants' character; *obviously administrative law judges will continue to assess the credibility of pain assertions by applicants*, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (emphasis in original). Thus, this court will continue to apply pre-SSR 16-3p circuit case law in reviewing an ALJ's evaluation of a claimant's subjective complaints.

Using all-too-familiar, formulaic language, the ALJ here wrote that Pettit's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 28.) Unfortunately, like so many others that come before this court, the ALJ's decision is long on recitation but short on analysis. In many instances, the ALJ merely states that he "considered" certain evidence in the record and leaves it at that, without explaining whether the evidence supported or detracted from plaintiff's disability application. This is not helpful. As SSR 16-3p makes clear, the ALJ's task is to weigh the evidence and make clear to subsequent reviewers *how* he weighed the evidence and *why* he determined that some evidence was more worthy of credence than others. SSR 16-3p ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."). It is befuddling why the Commissioner cannot train her ALJs to better expound on their reasoning.

Nonetheless, the articulation requirement is undemanding: an ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger*, 516 F.3d at 545 (quoting *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). Although the reasons underlying the ALJ's decision that Pettit was not as limited in her ability to reach as she claimed to be are far from transparent, with some

effort they can be teased out. *Cf. Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (remanding case for further articulation because "we don't know what [the ALJ] thought"). Foremost was the disconnect between Pettit's subjective complaints and the objective medical evidence. As the ALJ noted, Pettit applied for SSI while she was recovering from her second surgery, but later records showed "little evidence of continued problems after these surgeries." (AR 26.) Citing two examples, the ALJ noted that in late September 2014, Pettit exhibited normal cervical range of motion with only minimal discomfort and a year later, she was noted to be sitting comfortably during the examination and was not in any acute distress. (*Id*.) Elsewhere in his decision, he noted that six months after her surgery, Pettit's doctor found she had a stable fusion, good pain-free range of motion in her arms and good muscle tone, bulk and strength, although she did have some tenderness in upper back and neck with associated limits on range of motion in her neck. (AR 24.) By July 2014, Pettit told her doctor that her neck pain was "somewhat better" since surgery and she occasionally had right-sided pain, but she denied numbness or tingling in her left arm. (*Id.*) In September 2014, she had normal range of motion in her neck with only minimal discomfort and no weakness in her arms, and EMG and nerve conduction studies administered in October 2014 were normal. (AR 25.) These citations support the ALJ's conclusion that Pettit's condition had improved after the second surgery and that there were few objective findings to support her claim of total disability.

As a further reason for discounting Pettit's subjective complaints, the ALJ noted certain inconsistencies in the record. Specifically, he noted that on September 9, 2013, Pettit drove herself to a disability interview, yet later that month she reported that she was

unable to turn her head sufficiently to drive a vehicle. (AR 26.) The ALJ further pointed out that although Pettit had alleged that pain had taken over her life and limited her activities "to virtually nothing, there is no evidence of muscle atrophy or wasting upon examination." (AR 26.) Pettit has raised no objection to either of these findings, both of which are reasonably supported by the record. Indeed, SSR 16-3p explicitly recognizes the absence of muscle wasting as a reason to question a claimant's report that pain has caused extreme limitations in her activities. Of course, the absence of muscle wasting would not necessarily be inconsistent with Pettit's claimed difficulties in overhead reaching, but the ALJ was justified in being skeptical of those reports given the other inconsistencies he observed.

Third, the ALJ rested his RFC finding (and his corresponding rejection of Pettit's report of greater limitations) on the medical source statements in the record. The ALJ explained that in arriving at his RFC assessment, he gave "great weight" to the opinions of the state disability consultants, Drs. Mina Khorshidi and Janis Byrd. (AR 29.) As noted above, both Drs. Khorshidi and Byrd opined that Pettit could perform light work, but Khorshidi found that Pettit had a "limited" ability to perform overhead reaching on both sides, whereas Byrd found Pettit had no limitations on reaching. The ALJ explained that he gave greater weight to Dr. Khorshidi's assessment than to Byrd's because it was more consistent with Pettit's medical history of having had two cervical fusions. At the same time, however, he explained that Pettit's functioning had improved since surgery, proof of which lay in "Dr. Byrd's determination that the claimant would no longer require any [manipulative] limitations." (AR 29.) Apparently deciding that the truth lay somewhere

in the middle, the ALJ found that Pettit was capable of bilateral overhead reaching on a "frequent" but not unlimited basis. [8]

Pettit takes issue with this approach, asserting perfunctorily that reversal is required because the record contains "no medical authority stating Pettit can do frequent overhead reaching bilaterally." (Pl.'s Br. (dkt. # 9) 32.) Contrary to Pettit's suggestion, an ALJ need not link every limitation in his RFC assessment to a corresponding medical opinion. Rather, the RFC assessment is "based on all the relevant evidence in [the claimant's] case record," 20 C.F.R. 416.945, including objective medical evidence, medical source statements and the claimant's own statements about her limitations. 20 C.F.R. 416.912(b). Thus, the question is not whether the record contains an opinion from a medical source stating explicitly that Pettit can perform overhead reaching on a frequent basis, but whether the ALJ adequately explained how he reached his conclusion and whether substantial evidence in the record supports it.

Absent any pointed challenge from Pettit to the ALJ's assessment of the medical opinions, the court is satisfied that, in determining that Pettit could perform overhead reaching on a frequent basis, the ALJ reasonably weighed and resolved the conflicting evidence on that point. As he noted, Dr. Khorshidi determined, just a few months after Pettit's second surgery, that her ability to perform overhead activities was "limited."

---

[8] Although Pettit does not raise the issue, presumably this same reasoning would explain why the ALJ did not adopt Dr. Porter's January 2013 statement -- before Pettit's second surgery -- that Pettit should perform overhead reaching only on an occasional basis. The ALJ mentioned that Dr. Porter had advised Pettit in December 2012 to avoid overhead work, but did not say how or if that evidence factored into the ALJ's RFC assessment. However, Pettit has not developed any argument concerning Dr. Porter's statements, thereby waiving it.

Notably, Dr. Khorshidi did not specify the degree to which Pettit was limited or estimate how often she could perform overhead activities. Seven months later, Dr. Byrd concluded from her review of Pettit's records that Pettit had no limitations on her ability to perform overhead activities. Medical examinations between the dates of the two state agency opinions repeatedly found few objective abnormalities and that Pettit's arm strength and mobility were good, yet Pettit still complained of neck pain. Although reasonable minds could disagree, the ALJ reasonably resolved this conflicting evidence by finding that although Pettit had improved after surgery, she still had some limitations that prevented her from performing overhead work more than two-thirds of the workday.

Finally, the ALJ seemed to question Pettit's honesty when he noted that Pettit told some of her care providers that she wanted to return to work and was pursuing DVR services, yet she failed to follow up with her DVR counselor after the counselor told her that participation could hinder her ability to receive Social Security benefits. (AR 26.) The court agrees with Pettit that, to the extent the ALJ appears to have inferred that Pettit chose to forego DVR services in order not to jeopardize her claim for SSI benefits, the record does not reasonably support such an inference. To the contrary, the relevant notes indicate that Pettit discontinued DVR services at the urging of her counselor, who recognized the dilemmas posed by Pettit's need to recover completely from her surgery and inability to look for work given her lack of gas money. (AR 684.) Nonetheless, the court need not reverse an ALJ's credibility determination merely because he cited one bad reason, so long as he cited other good reasons for rejecting the plaintiff's subjective complaints. *McKinzey v. Astrue*, 641 F.3d 884, 890-91 (7th Cir. 2011) (upholding ALJ's credibility

finding even though two of three reasons cited by ALJ were flawed); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (ALJ's credibility finding can be flawed but still not "patently wrong"). As just discussed, there are other discernible reasons apart from the DVR note for the ALJ's determination that plaintiff was not as restricted in her ability to reach overhead as she claimed to be. Those reasons -- though far from robust -- have adequate support in the record and are not patently wrong.

### III. Neck Movement and Rest Breaks

Pettit's remaining objections to the RFC assessment require little discussion. Although plaintiff suggests in her brief that she is "unable" to move her neck, she testified at the hearing that she can move it in all directions (up, down and to either side), but that she did so slowly and was unable to achieve full range of motion on rotation. (AR 50-51.) As the ALJ noted, physical examinations routinely showed that her neck range of motion was acceptable and Pettit was noted to have driven in spite of her reports that she was unable to do so. Further, neither of the state agency physicians included limitations on neck movements when they assessed Pettit's ability to work, and in any case Pettit does not suggest that any of the jobs identified by the VE would require frequent or repetitive neck rotation.

As for her need for frequent rest breaks, Pettit cites her testimony that she either sits or lies down 4.5 to 5 hours a day because of her neck pain. As noted previously, however, the ALJ observed that there was no evidence of the muscle atrophy or wasting that one would expect if Pettit's activities were as severely restricted as she claimed.

18

Moreover, the state agency physicians and Dr. Lamberson, who treated Pettit after her second surgery, all opined that she would be able to perform at least light work on a regular basis. This was substantial evidence to support the ALJ's conclusion that Pettit was able to sustain full time work and that her allegations to the contrary were not credible.

ORDER

IT IS ORDERED that the decision of defendant Andrew M. Saul, Commissioner of Social Security, is AFFIRMED and plaintiff Tracy Pettit's appeal is DISMISSED. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 25th day of September, 2019.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge